UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY VANZANT

                   Petitioner,              Case No. 1:13-cv-125

v.                                    Honorable Paul L. Maloney

CARMEN D. PALMER

                   Respondent.

_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.

Following a bench trial in the Lenawee County Circuit Court, Petitioner Anthony VanZant was convicted

of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, assault with intent to rob while

armed, MICH. COMP. LAWS § 750.89, possession of a firearm during the commission of a felony (felony

firearm), MICH. COMP. LAWS 750.227b, carrying a weapon with an unlawful intent, MICH. COMP. LAWS

§ 750.226, and being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f.  On January 3,

2008, Petitioner was sentenced as a fourth-offense felony offender, MICH. COMP. LAWS § 769.12.

However, on September 26, 2008, on remand from the Michigan Court of Appeals, he was resentenced

as a third-offense felony offender, MICH. COMP. LAWS § 769.11, to life imprisonment for assault with

intent to murder, 56 years and 3 months for assault with intent to rob while armed, 2 years for felony

firearm, and two terms of 3 years and 4 months to 5 years for carrying a weapon with unlawful intent and

being a felon in possession of a firearm.  In his *pro se* petition, Petitioner raises 13 grounds for relief, as

follows:

    I.     [PETITIONER] WAS DEPRIVED OF HIS AMS. V AND XIV RIGHTS OF DUE PROCESS WHEN HE WAS INVALIDLY SENTENCED TO CONSECUTIVE TERMS.

    II.    [PETITIONER] WAS DEPRIVED OF HIS AMS. V AND XIV RIGHTS OF DUE PROCESS WHEN THE COURT WRONGFULLY ASSESSED RESTITUTION.

    III.   [PETITIONER] WAS DEPRIVED OF HIS AM. VI RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO RAISE THE FOREGOING ISSUES.

    IV.   TRIAL COUNSEL WAS INEFFECTIVE DUE TO LACK OF EXPERIENCE TO MATCH THE COMPLEXITY OF THE CASE AND THE EXPERIENCE OF THE PROSECUTING ATTORNEYS.

        a.    DEFENSE COUNSEL FAILED TO CONTACT AND CALL AS AN ALIBI WITNESS AMANDA BLANKS.

        b.    DID DEFENSE COUNSEL FAIL TO OBTAIN THE GUN SHOT RESIDUE TEST RESULTS FOR EXCULPATORY USE AND FAIL TO OBJECT TO THE LACK OF RESULTS OF THE GUN SHOT RESIDUE TEST BEING MADE AVAILABLE FOR TRIAL BY THE PROSECUTION?

        c.    WAS CUSTODIAL INTERROGATION A VIOLATION OF MR. VANZANT'S CONSTITUTIONAL RIGHTS?

    V.    PETITIONER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PURSUE VIABLE DEFENSES PRIOR TO THE SCHEDULED TRIAL DATE.

    VI.   PETITIONER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF

COUNSEL WHERE DEFENSE COUNSEL FAILED TO FORMALLY
MOVE FOR A LESSER INCLUDED OFFENSE.

VII.    PETITIONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL WHEN COUNSEL FAILED TO PROPERLY ADVISE
PETITIONER WITH REGARD TO THE WAIVER OF A JURY TRIAL.

VIII.   PETITIONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL WHERE DEFENSE COUNSEL FAILED TO USE
EXCULPATORY EVIDENCE IN SUPPORT OF PETITIONER.

IX.     PETITIONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL WHEN COUNSEL FAILED TO USE PRIOR INCONSISTENT
STATEMENTS TO IMPEACH PROSECUTION WITNESSES.

X.      PETITONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL WHEN COUNSEL FAILED TO OBTAIN CRIMINAL
RECORDS AND CONVICTIONS OF PROSECUTION WITNESSES, AND
OF THE VICTIM, TO IMPEACH THEIR TESTIMONY.

XI.     PETITIONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL WHEN VALERIE NEWMAN WAS NOT
PRESENT AT A CRITICAL STA[G]E OF THE PROCEEDINGS: RE-
SENTENCING.

XII.    PETITIONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL WHERE APPELLATE COUNSEL FAILED TO
SUBMIT FOR FILING PETITIONER'S STANDARD-4 BRIEF PURSUANT
TO ADMINISTRATIVE ORDER 2004-6 MINIMUM STANDARDS FOR
INDIGENT CRIMINAL APPELLATE DEFENSE SERVICES STANDARD-4
IN A TIMELY MANNER RESULTING IN THE COURT OF APPEALS
REJECTING BRIEF.

XIII.   PETITIONER WAS DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF

APPELLATE COUNSEL WHERE APPELLATE COUNSEL FAILED TO
RAISE THE ISSUES CONTAINED IN THIS MOTION FOR RELIEF FROM
JUDGMENT ON DIRECT APPEAL.   THIS SATISFIES THE "GOOD
CAUSE" REQUIREMENT.

(Mem. in Supp. of Pet., ECF No. 3, PageID.30-32.)  On August 28, 2013, Respondent filed an answer

to the petition (ECF No. 9), stating that the grounds should be denied because they are noncognizable,

procedurally defaulted, and/or without merit.  On September 3, 2013, Respondent filed the state-court

record, pursuant to Rule 5, RULES GOVERNING § 2254 CASES.  (ECF Nos. 11-25.)  Upon review and

applying the AEDPA standards, the Court finds that all habeas grounds are meritless. Accordingly, the

Court will deny the petition for failure to raise a meritorious federal claim.

## Procedural and Factual Background

Petitioner's conviction arose out of Petitioner's attempt to rob Michael Sumner, using a .22

caliber handgun.  When the victim had no money, Petitioner shot him twice, in the head.  Petitioner was

charged with the five offenses on which he was ultimately convicted, as well as armed robbery.  Following

a preliminary examination held on October 3, 2007, Petitioner was bound over on all charges, except the

armed robbery, which was dismissed by the prosecutor.  (Prelim. Exam. Tr., 34-37, ECF No. 12.)

Petitioner also was charged as a fourth-offense felony offender.  (Register of Action, ECF No. 11.)

Petitioner was tried before a judge on April 27, 2007.[1]  Adrian Police Detective Greg

Lanford testified that he collected two rocks of crack cocaine at the Suzy Cues Car Wash where Petitioner

was found on the night of the incident.  Lanford also collected a gold piece chain near the car wash, as well

as the surveillance videotape from the car wash.  (Tr., 5, ECF No. 16.)

---

[1]The single trial transcript is hereafter referenced as "Tr., __."

Jaretta Henry testified that Petitioner was her uncle, and he lived with Henry and her mother on and off. (*Id.*, 7.) Petitioner arrived home on May 16, 2007, shortly before the police arrived. (*Id.*, 8.) Ardella Henry, Jaretta's mother, testified that Petitioner was her brother. She arrived home from work at about 2:30 a.m. (*Id.*, 9.) Petitioner was not at the apartment at that time and only arrived about three minutes before the police came. When the police came, she had been telling Petitioner that Michael Sumner, a close friend of the family, had been shot, information she had received from her daughter, who had received a call. (*Id.*, 10.)

Joshua Sheperdson testified that he was the 911 dispatcher on the night of May 16, 2007, from 11:00 p.m. to 7:00 a.m. (*Id.*, 11.) He received the initial call from the victim, who reported having been shot. (*Id.*, 12.) Lenawee County Dispatcher Britani Warner took the second 911 call, which came from a hysterical female witness to the shooting. (*Id.*, 13.)

Adrian Police Department Corporal Norm Helinski was the supervising officer at the Village Green Apartments in Adrian, Michigan on May 16, 2007. (*Id.*, 15.) Adrian Police Officer Curt Whiting was dispatched to the Suzy Cue Car Wash on May 16, 2007, where he found Michael Sumner sitting. Sumner had an injury to his face, and he reported being shot. Sumner first stated that he had been shot in front of the Village Green Apartments. Sumner subsequently stated that he had come out of an apartment to call for a ride and someone came up, asked for money, shot him in the face, and then shot him again after he fell down. Sumner denied knowing who had shot him. Sumner kept repeating that his head hurt and it hurt to think. Sumner did not appear to Helinski to be cooperating and providing complete information. (*Id.*, 17.) After Sumner was transported to the hospital, Whiting returned to the scene of the shooting and remained there until the detectives arrived. (*Id.*, 19.) Whiting saw no physical evidence

corroborating that Sumner was shot outside. (*Id.*, 18.) He initially assisted Officer Gardner in a consensual search of 1516 Village Green, which was Ardella Henry's apartment. Gardner saw Petitioner at the apartment, and Petitioner's demeanor appeared normal. (*Id.*, 19.) Gardner had seen Petitioner on a prior occasion. Petitioner kept repeating that the police had nothing on him, but he was fully cooperative. (*Id.*, 20.)

Courtney Brooks testified that she met Petitioner through her friends Jay and Enis. Petitioner called Brooks both before and after the shooting, but she did not receive the first call and he did not leave a message. (*Id.*, 22-23.) On the second call, which occurred at 3:00 or 3:30 a.m., Petitioner told her that the police were looking for him for something he did not do. (*Id.*, 23-24.) She called Amanda Blanks after talking to Petitioner. (*Id.*, 24.)

Officer Lamar Rufner was one of the officers who responded to the scene of the shooting. He transported witness Michelle Moore to the police station. She told him that a black male she knew as "AP" had shot Michael Sumner in the head, twice. (*Id.*, 26.) Moore also told him that she, Ashley Secord, and Michael Sumner were inside the apartment. AP got upset when he learned that Sumner and Secord were in a sexual relationship, after which he shot Sumner. (*Id.*, 26-27.)

Officer Bradley Horn also assisted in responding to the 911 call. He arrived at the Suzy Cue Parking lot, where he found Sumner on the ground. Thereafter, he went to the apartment at which the shooting apparently had taken place. He and Officer Gardner went inside the apartment to make sure there were no other injuries, and Gardner remained at the apartment to secure the scene. (*Id.*, 29.) Horn could see blood on the floor. (*Id.*, 31.) He spoke with Amanda Blanks and Courtney Brooks. (*Id.*, 29-30.)

Officer Herbert Gardner testified that he was part of the general response to the team and had assisted Officer Whiting in taking Petitioner into custody.  (*Id.*, 33.)

Detective Lynn Courington interviewed Michelle Moore and Ashley Secord at the police station in the early morning hours of May 16, 2007.  (*Id.*, 37-38.)  Moore was not intoxicated or hysterical, but she was nervous.  Secord did not want to have her responses tape-recorded, but the tape was never turned off.  (*Id.*, 38.)

Michelle Moore[2] testified that she was 22 years old.  As a result of the incident on May 16, 2007, Moore had entered a guilty plea to the charge of larceny in a building.  (*Id.*, 41.)  On the date of the incident, she was at Ashley Secord's apartment with Petitioner.  (*Id.*)  Early in the evening, Mr. Rincon came over, and Secord bought some cocaine from him, though she did not pay for it at that time.  Secord and Moore used the cocaine, and they drank alcohol.  (*Id.*, 53-54.)  Michael Sumner came over at about 10:00 p.m. to hang out.  (*Id.*, 42, 55.)  By this time, Moore's daughter was alone in Moore's apartment, sleeping upstairs.  (*Id.*, 51.)  Petitioner pulled Moore and Secord aside at different times to discuss having Moore and Secord steal Sumner's wallet.  The plan was to distract Sumner by having Moore and Secord engage in sexual activity with Sumner so that they could steal  money from his wallet when he was not looking.  (*Id.*, 43, 54.)  At some point, Sumner and Secord went to the store to get beer. At about midnight, Secord and Moore went to Moore's apartment next door, and Sumner came over shortly thereafter.  (*Id.*, 43-44, 54-55.)  When Sumner arrived, Moore and Secord were upstairs in Moore's bedroom, engaged in sexual activity.  (*Id.*, 44.)  Sumner watched for a few minutes, and then all

---

[2]Michelle Moore's name had changed to Michelle Reed by the time of her testimony.  (*Id.*, 41.)  The Court will use the name "Moore" for consistency with the testimony of others.

three had sexual relations. Secord left the room briefly to go to the bathroom, as did Sumner. During that time, Moore looked through Sumner's wallet and found nothing. (*Id.*, 45, 56.) About a half-hour later, Petitioner came into the bedroom. (*Id.*, 45.) Moore left the room and went over to Secord's apartment. She came back five minutes later to find that Petitioner was arguing with Sumner. Sumner was in the process of dressing. Petitioner was saying something about "how Michael could trick with his boy's girl." Moore stated that she did not know what Petitioner meant. Petitioner and Sumner began to argue more vigorously. (*Id.*, 46.) Moore started to leave the room when she heard two shots fired. She saw Petitioner with the gun in his hand, but she did not see him fire the shots. Petitioner was standing less than five or six feet from Sumner when Petitioner fired the shots. Sumner fell onto the bed, bleeding from his face. Sumner said to call 911. Moore was hysterical. The plan had been to steal Sumner's wallet. (*Id.*, 47.) She did not know that Petitioner had a gun. Petitioner then left the room, and Moore followed him, screaming at him for shooting someone. (*Id.*, 47-48.) When Moore came back, Sumner was starting to come down the stairs. Moore handed Sumner a towel, and Sumner said he did not know it was that bad. Once Sumner got outside, Moore heard three more gunshots. She was in her kitchen calling 911. (*Id.*, 49.) Moore indicated that she was hysterical, and she did not remember the content of what she said to the 911 operator. (*Id.*, 49-50.)

Ashley Secord testified that she and Moore were next-door neighbors. (*Id.*, 61.) Secord acknowledged that, though she originally was charged with conspiracy to commit armed robbery and armed robbery, she pleaded guilty to larceny in a building, in exchange for her trial testimony. (*Id.*, 61.) Secord had known Petitioner for a year or more. (*Id.*, 71.) According to Secord, she, Moore and Petitioner were using cocaine on the night of the shooting. Secord also had purchased Ecstasy earlier that

day, and she had taken it. (*Id.*, 62-63, 74-75.) At some point during the day, Petitioner had suggested, "Let's hit a lick."[3] (*Id.*, 63.) She treated the statement as a joke, because Petitioner often talked like that. (*Id.*, 71.) Secord returned a phone call to Sumner and told him that she and Moore were going to drink. Sumner asked to come over, and he brought cocaine when he came. (*Id.*, 62-63.) Petitioner, Moore and Secord eventually concocted a plan to engage in sexual activity at Moore's house and to include Sumner, at which point they would steal Sumner's wallet. (*Id.*, 63.) Before Secord and Moore went over to Moore's house, Secord and Sumner went out to buy cigarettes and beer. (*Id.*, 64.) They drank at Secord's house for awhile. (*Id.*, 64.) Then Secord and Moore went next door to Moore's house, went upstairs, and began to have sex. (*Id.*, 65.) Before she left, Secord asked Petitioner to watch her three-year-old child, who was upstairs sleeping. (*Id.*, 70-71.) Sumner came over awhile later and joined them in the sexual activity. (*Id.*, 66.) Secord and Sumner went into the bathroom and had sex together. (*Id.*, 73.) After they came back into the room, Moore left. (*Id.*, 74.) Secord heard a door open downstairs, and then the bedroom door opened. Secord was high and drunk. She got up, as did Sumner, who began to dress. (*Id.*, 65.) Petitioner came into the room. Petitioner said something like, "You are not tricking off with my friend . . ." or "Tricking along with his home girl for free . . . ." (*Id.*, 66, 77.) Petitioner also demanded, "Give me your money . . . ." (*Id.*, 77.) Secord heard a noise that sounded like a pop gun, and she saw Sumner fall. She was scared and looking for her cell phone, so she did not see Sumner get hit by the bullets. She saw blood on Moore's wall after the second shot. (*Id.*) Petitioner was laughing and acting

_____

[3]Both by context and definition, to "hit a lick" means to gain a lot of money in a short time, typically by robbing or burglarizing. *See* Online Slang Dictionary, http://onlineslangdictionary.com/meaning-definition-of/hit-a-lick. During his testimony, Petitioner defined hit a lick as follows: "Hit a lick is to set somebody up to turn a trick . . . any kind of way of retrieving money from somebody. It could be a robbery, turn tricks or setting somebody up or anything along those lines." (Tr., 119.)

crazy. (*Id.*, 68.) Secord told Petitioner to go, to get away. Secord did not see the gun in Petitioner's hand until they went outside. (*Id.*, 66-67.) She saw Sumner walk toward the car wash, and she saw Petitioner shooting into the air. Although they had planned to rob Sumner, that plan did not include using a gun. (*Id.*, 67.) After Petitioner walked away, Secord went upstairs with her son and fell asleep, as she was very intoxicated. (*Id.*, 79-80.)

Michael Sumner testified that he had known Petitioner for four or five months before the assault. (*Id.*, 83.) Sumner testified that he had gotten out of jail after a probation violation about three days earlier. Secord called him on and off during those three days. On the night of May 16, Secord called him, and he drove over to Secord's apartment at about 11:00 or 11:30 p.m. (*Id.*, 83-84.) When he arrived, Secord and Moore were in the living room, and Petitioner was in the basement. Secord, Moore and Sumner talked and listened to music. (*Id.*, 84-85.) Sumner and Secord left at some point to get cigarettes, and Moore called to ask them to get a six-pack of Bud Light or wine coolers. After picking up the items at Wesco, they returned to Secord's apartment. (*Id.*, 85.) After awhile, as Sumner was preparing to go home, the girls suggested going next door to Moore's apartment, and they hinted at having sex. (*Id.*, 85-86.) They walked over together, and the two women went upstairs, telling him to wait downstairs a minute before coming up. He walked around the living room and kitchen briefly, and then he went upstairs, where the girls were giggling in bed. After seeing them, and because he did not know the girls that well, he walked back downstairs, saying that he had to go to the bathroom. He hid his money in the kitchen, under an appliance. (*Id.*, 86-87.) When he got back upstairs, the girls were lying naked, under the blankets, engaging in sex. He watched for awhile and then he took off his clothes and joined them, having sex with both women. (*Id.*, 87.) However, the women received a couple of phone calls and Secord

-10-

kept running downstairs, so Sumner began to become suspicious. He heard the door shut and then Secord came up. Sumner asked who was at the door, but Secord replied, "Nobody." (*Id.*, 88.) Both Secord and Moore began to be more fidgety and anxious, and they watched the door a lot. While Sumner was grabbing his belongings, he heard Secord walk up the stairs talking to Petitioner. (*Id.*, 88.) Petitioner came into the doorway with a handgun, probably a .22 caliber revolver, in one hand and a bottle of Captain Morgan in the other. (*Id.*, 88, 100.) Petitioner pressed Sumner to have a drink of Captain Morgan, and Sumner acquiesced. However, Sumner denied using drugs that night. (*Id.*, 90, 100.) Secord followed just behind Petitioner. Moore came behind Secord. (*Id.*) Petitioner asked Sumner to give him money, but Sumner said that he had none. Sumner showed Petitioner his wallet, which was empty. Petitioner said, "Why don't you give the girls money? They want cigarettes." (*Id.*, 89.) Sumner argued some with Petitioner. Petitioner again said that he knew that Sumner had money and that should give Petitioner all the money he had. Sumner reminded Petitioner that he had no money in his wallet and he emptied his pockets for Petitioner, showing him that he had none. Petitioner said, "Are you willing to die for your money?" (*Id.*) Sumner responded, "I guess so because I don't have any." (*Id.*) Petitioner then asked for Sumner's jewelry. Sumner responded, "With this fake jewelry you are going to kill me over fake jewelry?" Petitioner fired a warning shot into the corner. Sumner tried to calm down and assess the situation, and he may have moved slightly closer to Petitioner. (*Id.*, 90-91.) Petitioner jerked his hand up and shot Sumner in the forehead and the left temple. Because Sumner was blind in his right eye, Petitioner's shot to the left side of his head took away Sumner's vision. Sumner stepped back and looked at the blood pouring into his hand, saying, "Why in the F did you shoot me . . . . You didn't kill me. You shot me." (*Id.*, 91.) Sumner was worrying about his vision and then fell back on the mattress, semi-passed out. He

heard Secord say, "You killed him. You killed him. I didn't know that you were going to kill him." (*Id.*, 92.) He also could hear Moore saying, "You shot him and he is bleeding all over my room and house." (*Id.*) As the others walked off, Sumner sat up and started grabbing his things and putting his clothes on. He walked out of the bedroom and into the bathroom, where he grabbed a towel. He walked down the stairway, went into the kitchen, found his money, and put it in his pocket. Sumner then walked to the hallway in front of the door. (*Id.*) Moore came into the house, yelling at Sumner and cursing, complaining that he was bleeding all over her house. Sumner asked, "Is it that bad?" (*Id.*, 93.) Moore did not respond, and Sumner walked out the door. Petitioner and Secord got quiet as Sumner left. Petitioner then said, "You better not call the cops." (*Id.*) Sumner started pacing around the parking lot and realized that he needed to call the police. He pulled out his phone and called the police to report a shooting at Village Green Apartments. When they asked if anyone was injured, he told them that he had been shot twice in the head and needed a ride to the hospital. While he was on the 911 call, he heard a couple of additional shots, but his back was facing Petitioner. The 911 operator said that she could hear shooting. Sumner told the police to meet him at the entrance to the apartments, where there was a car wash. (*Id.*, 94.) Sumner was life-flighted to Toledo Hospital, where they operated on him for a number of hours. He remained in the hospital for a week or two. He has vision in his eye, but he experiences problems and is at additional risk of other vision problems. (*Id.*, 95.)

Adrian Police Detective Vincent Emrick testified that, as the officer in charge of the case, he found that Petitioner had a 1984 conviction for conspiracy to commit armed robbery, a 2001 conviction for grand theft, and a 2007 conviction for aggravated stalking. (*Id.*, 102, 104.) A weapon was recovered about a month after the shooting, from a building adjacent to the apartment complex, about three buildings

away from the apartments of Moore and Secord. (*Id.*, 103.) The gun was submitted to the lab, but Emrick received no report. Emrick also never tested Petitioner for gunshot residue. (*Id.*, 103.)

Petitioner testified that, on the evening of the incident, he was visiting Rebecca Brownfield, at the 4100 block of Sharp Road. Brownfield dropped him off at the Village Green apartment complex at about 11:00 p.m. or 12:00 a.m., and he went to his sister's house. Once there, he went to the basement and put some .22 long caliber cartridges in his jacket, because he had been at a ranch, playing with his .22 rifle. (*Id.*, 106.) Petitioner received a call from Ashley Secord, wanting him to babysit her child. He went over to Secord's apartment. When he arrived, Secord and Moore were snorting cocaine and doing street drugs. Sumner was not at the house. Secord's son was upstairs, sleeping, and Moore's daughter was in the living room. (*Id.*, 107.) Petitioner claimed that Moore and Secord told him that they wanted to hit a lick against Michael Sumner. Petitioner told them that Sumner was very close to Petitioner's family and a friend of his nephew. He also showed them that he had about $1,000.00 from selling cocaine. (*Id.*, 108, 110-11.) Secord told Petitioner, "You're a hole ass nigger. Watch it go down." (*Id.*, 108.) She then called Sumner to invite him over at about 12:00 or 1:00 a.m. (*Id.*) Petitioner testified that, after Sumner arrived, they all went to the basement and talked. Sumner, Secord and Moore were all drinking Captain Morgan, Tarantulas, mixed drinks and beer. He also saw Secord and Moore use cocaine, though Sumner did not. (*Id.*, 109.) Petitioner and Sumner were also shooting dice. They remained downstairs for half an hour to forty-five minutes. Sumner went to the store. Sometime after that, Secord and Moore went over to Moore's apartment. Sumner said, "You see how Ashley is. I have to hit that tonight." (*Id.*, 110.) Secord returned and asked Sumner to come over, and Petitioner remained in the apartment alone with Secord's child, who was sleeping in the upstairs bedroom. About twenty minutes after Sumner left for the

other apartment, a short, Hispanic man came over and said he was "Mike" and was looking for Secord. (*Id.*, 111.) Petitioner later learned that the man was Mike Rincon. Petitioner told the man that Secord was next door at Moore's house. A bit later, a white women came looking for Secord. Again, Petitioner said that Secord was next door. (*Id.*, 112.) Shortly thereafter, Petitioner received a call about buying crack cocaine. He tried to reach Secord by phone, but he received no answer. Petitioner went next door and knocked. Moore answered, asking what he wanted. Petitioner told Moore to tell Secord that he was getting ready to leave. Petitioner grabbed his things and walked to the West Pointe Store, which is adjacent to the Suzy Cue Car Wash. About ten minutes later, his buyers showed up and they completed the drug sale. Petitioner was on his way back to the Village Green apartments when he saw Sumner, who was saying that he was shot and was calling 911. Petitioner was afraid that the man who had shot Sumner would come after him, because he had drugs on him. He ran the opposite way toward Miller's Diner, and he took the long way to his sister Ardella Henry's house in Adrian Village. (*Id.*, 113.) On his way, he stopped at Amanda Blanks' house. He told Amanda that Sumner had just gotten shot. Petitioner proceeded to his safe house, where he stashed his drugs and his money. He then went to his sister's house, arriving about ten minutes before the police. His sister was not home, and his niece was asleep. Petitioner went to the basement and put away the bullets from his pocket. He was sitting down when his sister came in and his niece woke up. (*Id.*, 114.) His niece had gotten a phone call from Moore, and she was going down to see what was going on. Petitioner emphasized that he had the bullets in his pockets from shooting at the ranch. He denied hearing any gun shots. When the police arrived and questioned him, he did not ask why he was being arrested. (*Id.*, 115.)

Following oral arguments, the court took a brief recess and then made its findings of guilt on all remaining charges. (*Id.*, 124-29.) On January 3, 2008, Petitioner was sentenced as a fourth-offense felony offender to prison terms of two years on the felony-firearm conviction, to run consecutively to 40 to 60 months on the conviction for carrying with unlawful intent, 900 to 1900 months on the conviction for intent to rob while armed, and life imprisonment on the conviction for assault with intent to murder.[4] (Sentencing Tr. (S. Tr. I), 10, ECF No.17.)

Petitioner, through appellate counsel, moved for resentencing, arguing that the felony-firearm charge had originally been attached to the armed-robbery charge that was dismissed at the preliminary examination. Counsel argued that it could not be attached generally to all other convictions. In a second argument, counsel contended that one of the felonies on which the court relied for its finding that Petitioner was a fourth-offense felony offender was a larceny under $400.00 from California, which was considered by that state to be a misdemeanor. As a consequence, counsel argued, Petitioner was entitled to be resentenced as a third-offense felony offender. The prosecutor responded that Petitioner had other felonies that could have been used to make the fourth felony, but defense counsel urged that the prosecution was not entitled to amend the information to add a different offense at this point. (Hr'g on Mot. to Resentence Tr., 3-23, ECF No. 18.) The prosecutor elected to attach the felony-firearm conviction to the conviction for assault with intent to murder. (*Id.*, 16.) The court declined to allow the prosecutor to amend the information after the conviction to use a different felony to prove Petitioner's fourth-offense

---

[4]That same date, Petitioner was sentenced by the same judge to a prison term of two years and five months to five years on an unrelated charge of aggravated stalking, MICH. COMP. LAWS § 750.411i, to which Petitioner had pleaded guilty. The sentences in the instant case were to run consecutively to the sentence for aggravated stalking. (S. Tr., 4, 12.)

felony offender status.  (*Id.*, 27.)  At a hearing held on September 26, 2008, Petitioner was resentenced

as a third-offense felony offender.  (Resentencing Tr., ECF No 19.)  The court retained the life sentence

on the assault with intent to commit murder, but it resentenced on the assault with intent to rob while armed

to 675 to 1350 months' imprisonment.  The court made no other changes to the sentences.  (*Id.*, 12.)

Following his resentencing,[5] Petitioner appealed his conviction to the Michigan Court of

Appeals, raising the first three issues presented in his habeas petition.  Petitioner filed a supplemental brief

raising Petitioner's fourth habeas ground.  In an unpublished opinion issued on April 20, 2010, the court

of appeals denied all appellate grounds and affirmed the convictions and sentences.  (4/20/10 Mich. Ct.

App. (MCOA) Op., ECF No. 20.)  Petitioner raised the same four grounds in his application for leave to

appeal to the Michigan Supreme Court.  In an order dated July 26, 2010, the supreme court denied leave

to appeal, because it was not persuaded that the questions presented should be reviewed by the court.

(7/26/10 Mich. Ord., ECF No. 21.)

Petitioner filed a motion for relief from judgment in the Lenawee County Circuit Court.  In

his motion, Petitioner raised Grounds V through XIII of his habeas petition, all of which involve ineffective

assistance of trial or appellate counsel.  (Br. in Support of Mot. for Relief from J., ECF No. 38.)  The trial

court concluded that Petitioner was not entitled to relief from judgment, because his claims of ineffective

assistance of counsel had been presented to and rejected by the Michigan appellate courts on direct appeal.

(6/9/11 Cir. Ct. Ord., ECF No. 22.)

---

[5]Petitioner had previously filed an appeal from the original judgment, seeking a remand to file a motion for
resentencing.  The motion for remand was granted.  Following remand, Petitioner sought leave to file an untimely pro
se supplemental brief.  In the alternative, Petitioner moved to dismiss the appeal, as the principal issues were resolved
on remand.  The court denied the motion to file a supplemental brief, but granted the motion to dismiss the appeal as
moot in light of the resentencing.  (11/26/08 MCOA Ord., ECF No. 24.)

Petitioner filed an application for leave to appeal to both the Michigan Court of Appeals, raising the same nine issues raised in his motion for relief from judgment. The court of appeals denied leave to appeal on May 2, 2012. (5/2/12 MCOA Ord., ECF No. 22.) Petitioner filed a motion for reconsideration, which the court of appeals denied on June 13, 2012. Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same issues. The supreme court denied leave to appeal on November 20, 2012. (11/20/12 Mich. Ord., ECF No. 23.)

In his habeas application, Petitioner raises all 13 issues presented to and rejected by the Michigan courts on direct and collateral review.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I.    Ground I:  Consecutive Sentences

In his first ground for habeas relief, Petitioner contends that the trial court erred in ordering that his sentence for assault with intent to commit murder be served consecutively to his sentence for felony firearm, because the felony firearm was associated with the charge of armed robbery, which had been dismissed by the prosecutor at the preliminary examination. The court of appeals held that Petitioner did not challenge the trial court's decision to permit the prosecutor to amend the information to associate the felony-firearm charge with the charge for assault with intent to rob while armed, rather than with the charge of armed robbery, which had been voluntarily dismissed by the prosecutor at the preliminary examination. Regardless, the court upheld the trial court's conclusion that the amendment indisputably was proper, as Petitioner had notice of the conduct for which he was being charged at the time he was tried:  being armed with a .22 caliber pistol at the time he committed the assault.

The Due Process Clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him so as to

-19-

provide him an adequate opportunity to prepare his defense.  *See*, *e.g.*, *In re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977).  This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. *Combs v. State of Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976).  Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial.  *Id.*  "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review."  *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (quoting *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)).  "An indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings."  *Mira*, 806 F.2d at 639.  In other words, as long as "sufficient notice of the charges is given in some . . . manner" so that the accused may adequately prepare a defense, the Fourteenth Amendment's Due Process Clause is satisfied.  *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984); *Watson*, 558 F.2d at 338.

　　　　As the court of appeals held, Petitioner was on notice throughout trial that he was being charged with using a firearm to commit the offense of assault with intent to rob while armed.  After the prosecutor dismissed the armed-robbery charge, the district court found that probable cause existed as to all the remaining offenses, and it specifically held, "[I]t's very clear that this was an armed robbery that is – that was being attempted.  It was an assault with a firearm to – to – literally steal money.  There's no question that the evidence as to count two has been established."  (Prelim. Exam. Tr., 36, ECF No. 12.)  And the court subsequently held that ample evidence supported a finding of probable cause supported the charge of felony firearm because Petitioner had carried a firearm during his commission of the offense.  (*Id.*)

As a result, and as the court of appeals recognized, the bindover court "made findings of fact that implicitly amended the list of underlying felonies for the felony-firearm charge." (MCOA Op. at 2, ECF No. 20.) Moreover, as the court of appeals also recognized, the entire trial was conducted with the full knowledge of the conduct for which Petitioner was being tried, and the trial court made findings "beyond a reasonable doubt that . . . at the time of the assault that he was armed with a dangerous weapon that being a .22 caliber pistol." (*Id.* (internal quotations omitte).) Under these circumstances, the Michigan Court of Appeals reasonably applied established Supreme Court precedent in concluding that Petitioner failed to demonstrate that he was unfairly prejudiced by the amendment.

II.     Ground II:  Restitution

In his second ground for habeas relief, Petitioner contends that the trial court erred in ordering him to pay restitution in the amount of $75,185.54 without authentication of the victim's medical bills.  Petitioner's challenge to the imposition of any fine is not cognizable on habeas review, because fines and restitution are not subject to challenge in a habeas petition.  *See United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995).

III.     Grounds III through X:  Ineffective Assistance of Trial Counsel

In Grounds III through X of his habeas application, Petitioner complains of numerous instances of alleged ineffective assistance of trial counsel.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.

A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

### A.    Failure to raise Grounds I & II in trial court (Ground III)

Petitioner first argues that trial counsel rendered ineffective assistance in failing to raise his first two habeas grounds in the trial court. As discussed, Petitioner's first two habeas grounds are meritless.

Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

## B. Failure to contact and call alibi witness (Grounds IV & VIII)

In Ground IV of his habeas application, Petitioner argues that counsel was ineffective in failing to contact and call Amanda Blanks as an alibi witness. In Ground VIII of his application, Petitioner argues that counsel did not present the testimony of "several witnesses" who would have placed Petitioner elsewhere at the time the shooting occurred.

The Michigan Court of Appeals addressed Petitioner's fourth habeas ground as follows:

> Defendant argues that defense counsel was ineffective for failing to call Amanda Blanks as an alibi witness. "Ineffective assistance of counsel can take the form of a failure to call a witness or present other evidence only if the failure deprives the defendant of a substantial defense." *People v Hyland*, 212 Mich App 701, 710; 538 NW2d 465 (1995), mod on other grounds 453 Mich 902 (1996). "A defense is substantial if it might have made a difference in the outcome of the trial." *Id.*

> Blanks was listed on the prosecution's witness list and was subpoenaed for trial. Blanks did not appear, and the prosecutor moved to strike her because "her testimony ha[d] come in through the testimony of other witnesses." Defense counsel did not object. Defendant now claims that Blanks would have supported his alibi, but he has not provided a witness affidavit, or identified any evidence of record establishing that the proposed witness's testimony would have yielded favorable evidence that would have affected the outcome of trial. See MCR 7.210(A)(1). Defendant's unsupported assertion in his brief that the witness would have supported an alibi is insufficient to demonstrate that he was deprived of a substantial defense. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d (2003).

> Moreover, given defendant's own trial testimony, the proposed alibi evidence would not have placed him in a different locale at the time of the shooting. Defendant testified at trial that he stayed in Secord's apartment with Secord's child while the victim, Moore, and

Secord went to Moore's apartment.  Defendant stated that after about 30 minutes, he knocked on Moore's door to tell Secord he was leaving, and then walked to a nearby store.  Defendant claimed that he saw the victim at a nearby car wash on the way back, at which time the victim said that he had been robbed and shot.  Defendant claimed that he ran to avoid police contact because he had drugs in his possession, and because the person who shot the victim might be looking for him too because of his drug dealing.  He explained that as he was running, he saw Blanks and her mother outside, and briefly stopped to ask Blanks if she heard that the victim had been shot because she was familiar with the victim.  Under these circumstances, the fact that Blanks saw defendant in the immediate area after the shooting would not support an alibi defense or otherwise exonerate him.  Consequently, defendant has not shown that defense counsel was ineffective for failing to call Blanks.

(MCOA Op., 4-5.)

The state court's conclusion was patently reasonable.  According to Petitioner's own testimony, he saw Blanks only after the shooting had occurred, and he only spoke with Blanks briefly, at which time he mentioned that Sumner had been shot.  As a consequence, Blanks could not have provided an alibi to Petitioner for the relevant time frame.  Petitioner therefore fails to demonstrate that counsel rendered ineffective assistance in not calling Blanks, much less to overcome the double deference owed the state court's resolution of Petitioner's claim.

Petitioner's eighth habeas ground is wholly conclusory.  Petitioner does not even identify the alleged alibi witnesses who could have placed him elsewhere.  Presumably, those witnesses were the individuals to whom Petitioner allegedly sold drugs after leaving Sumner's apartment.  Petitioner, however, provides no affidavit from any alleged witness.  Moreover, he specifically states that trial counsel told him that she did not wish to call the witnesses, because she wished to concentrate on undermining the eyewitness testimony and physical evidence and believed that the witnesses would be "tripped up" by prosecutorial questioning.  (Pet'r's Br. in Supp. of Pet., ECF No. 3, PageID.105.)  As a consequence, by Petitioner's own admission, trial counsel made a strategic decision not to call the alleged alibi witnesses.  In the absence

of any evidence concerning the content of the witnesses testimony, Petitioner utterly fails to demonstrate that counsel's strategic decision was unreasonable. *Strickland*, 466 U.S. at 689.

### C.   Failure to object to *Brady* violation (Ground IV)

Petitioner next argues that counsel was ineffective in allowing the prosecutor to violate *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Specifically, he contends, the prosecutor somehow suppressed the results of gunshot residue tests, to which trial counsel made no objection.

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *Bagley*, 473 U.S. at 682); *see also Cone v. Bell*, *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

After reciting the relevant standard, the court of appeals held as follows:

Defendant has failed to establish a *Brady* violation. There is no indication that the prosecutor either possessed or suppressed gunshot residue test results. An officer testified that he did not submit gunshot residue for testing. Further, defendant has not shown that any such evidence would have been favorable to his defense. Because there is no basis for

finding a *Brady* violation, defendant cannot establish a claim of ineffective assistance of counsel in this regard.  See *Snider*, 239 Mich App at 425.

(MCOA Op., 5.)  The state court's findings of fact – that there existed no evidence that the prosecutor possessed any gunshot residue test results, that the lead detective did not submit such evidence for testing, and that the test results would have been favorable – are presumed to be correct, and Petitioner has produced no evidence to overcome that presumption.  *See Sumner*, 449 U.S. at 546.

Moreover, Petitioner cannot demonstrate that the prosecutor violated due process by failing to preserve any evidence of gunshot residue by testing Petitioner at the time he was arrested.  In *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988), the Supreme Court held that, in the case of a failure to preserve forensic evidence, a defendant may prove a due process violation only by showing that the government acted in bad faith, even if the unpreserved evidence was potentially useful to the defendant.  *See Youngblood*, 488 U.S. at 57.  Mere negligence by the government is insufficient to support a *Brady* violation in such circumstances.  *Id.*

> Part of the reason for the difference in treatment is found in the observation made by the Court in [*California v.*] *Trombetta*, 467 U.S. 479, 486 (1984)] that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, *see Lisenba v. California*, 314 U.S. 219, 236, 62 S. Ct. 280, 289, 86 L. Ed. 166 (1941), as imposing on the police an un-differentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.

*Id.* at 57-58.  Petitioner fails even to allege that the prosecution acted in bad faith in not preserving evidence of gunshot residue.

In sum, Petitioner fails to demonstrate the existence of a *Brady* error. Counsel therefore was not ineffective in failing to lodge an objection. *See Smith*, 591 F.3d at 523; *O'Hara*, 499 F.3d at 506; *Chegwidden*, 92 F. App'x at 311; *Harris*, 204 F.3d at 683.

### D.    Failure to object to custodial statement (Ground IV)

Petitioner argues that, after he invoked his right to remain silent and requested counsel, police nevertheless questioned him and assaulted him.

The Michigan Court of Appeals gave Petitioner's argument short shrift:

> Defendant's last claim is that he was denied the effective assistance of counsel because he was subjected to a custodial interrogation in violation of his right to counsel and was physically assaulted during the interrogation. "A criminal defendant has a constitutional right to counsel during interrogation." *People v Tierney*, 266 Mich App 687, 710; 703 NW2d 204 (2005) (citation omitted). Further, "statements . . . made during custodial interrogation are inadmissible unless the [defendant] voluntarily, knowingly, and intelligently waives his Fifth Amendment rights." *People v Abraham*, 234 Mich App 640, 644; 599 NW2d 736 (1999); see also, *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).
>
> Here, defendant has failed to provide any factual support for this claim. Indeed, he has not identified any custodial statements that he made or were admitted as evidence. Defendant must provide a factual basis to sustain his position. *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001) (citation omitted). Consequently, defendant has not established that defense counsel was ineffective in this regard.

(MCOA Op., 5-6.) The court of appeals properly cited and applied federal law. Moreover, the decision was correct on the facts. The record contains no information about an improper interrogation, and Petitioner provided none, either to the Michigan courts or this Court. Further, no statement was admitted into evidence to which an attorney could have objected. The claim therefore is frivolous.

### E.    Failure to investigate & pursue viable defenses (Ground V)

In his fifth habeas ground, Petitioner contends that his trial attorney was ineffective in failing to investigate and pursue viable defenses.[6]  Specifically, he contends that he told his attorney that he was innocent and that he wished to pursue the defense of intoxication.  Counsel, however, allegedly never interviewed two available witnesses to Petitioner's intoxication.  Petitioner also allegedly told his attorney that he wished to raise an alibi defense, yet his attorney did not interview the victim's aunt, who allegedly would have testified to Petitioner's innocence.  In addition, Petitioner contends that his attorney never investigated the plea agreements obtained by the prosecution witnesses in exchange for their trial testimony.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information

---

[6]The trial court rejected all of the claims of ineffective assistance of counsel that were raised in Petitioner's motion for relief from judgment (Grounds V through XIII) on procedural grounds, saying that Petitioner had previously raised those claims on direct appeal and they had been decided against Petitioner.  Because the state appellate courts merely denied Petitioner's claims in standard orders, their decision must be considered to have rested on the procedural default.  *See Guilmette v. Howes*, 624 F.3d 286, 289-92 (6th Cir. 2010) (*en banc*) (holding that brief form orders by the Michigan appellate courts invoking MICH. CT. R. 6.508(D) are unexplained orders within the meaning of *Ylst*, 501 U.S. at 803.  Such form orders are presumed to uphold or reject the last reasoned decision below).  However, the trial court's procedural determination was factually erroneous, as most of the claims of ineffective assistance of counsel that were raised in the motion for relief from judgment were not previously raised on direct appeal.  As a consequence, Petitioner did not commit the procedural error on which the court rested its decision, and Petitioner may not be considered to have procedurally defaulted his claims for the cited reasons.  *See Cone v. Bell*, 556 U.S. 449, 465 (2009) (holding that "'the adequacy of state procedural bars to the assertion of federal questions . . . is not within the State's prerogative finally to decide; rather adequacy is itself a federal question.'" (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)) (other internal quotations omitted); *see also Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001) (holding that, "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded."), *cited in Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005).  Because the trial court made no findings on the merits of the claims presented in the motion for relief from judgment, the Court must conduct *de novo* review of the merits of Petitioner's claims of ineffective assistance of trial and appellate counsel, as raised in Grounds V through XIII of the petition.

concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client. For example, in *Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003), the Supreme Court held that the petitioner was entitled to a writ of habeas corpus because his counsel had failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing. *Id.* According to the Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible." *Id.* at 527-28. Consistent with *Wiggins*, the Sixth Circuit has held, in a variety of situations, that counsel's failure to investigate constituted ineffective assistance in violation of the Sixth Amendment. *See, e.g., Towns*, 395 F.3d at 258-59. (holding that defense counsel's failure to investigate potentially important witness in robbery and felony murder trial was unreasonable, and thus constituted ineffective assistance, in violation of Sixth Amendment); *Combs*, 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the

crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory that the victim was shot at a distance); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (holding that counsel's failure "to investigate a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary"); *see also Clinkscale*, 375 F.3d at 443 (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance).

Nevertheless, the courts have rejected claims that counsel was deficient where the claim rests solely on a petitioner's unsupported claim that an attorney failed to investigate alleged known witnesses. *See Fitchett v. Perry*, ___ F. App'x ___, 2016 WL 1055939, at *3 (6th Cir. Mar. 17, 2016) (reiterating that "'[i]t should go without saying that the absence of evidence cannot overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."'") (quoting *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013)) (quoting *Strickland*, 466 U.S. at 689)). Although Petitioner argues that his attorney failed to investigate witnesses to his intoxication and his purported innocence, he provides no particulars about what such investigation would have revealed. He also utterly fails to provide evidence that would support those particulars. Under all of these circumstances, Petitioner cannot overcome the strong presumption that counsel's performance was reasonable.

Moreover, to the extent that he argues that those witnesses could have shown that Petitioner was intoxicated and therefore not capable of forming the requisite intent to kill, such a defense would have

undermined Petitioner's own testimony that he was not present and did not shoot Sumner.  Moreover, despite testifying to the effect that others were drinking and using drugs, Petitioner himself gave no indication that he was drinking.  (Tr., 109-10.)  Counsel's decision undoubtedly was strategic, and Petitioner fails to put forth any contrary evidence.

Finally, Petitioner utterly fails to demonstrate either that counsel failed to obtain the plea agreements signed by Moore and Secord or that those agreements were something other than what was testified to at trial.  He therefore fails to demonstrate either that counsel's performance was deficient or that he was prejudiced in any way.

As a consequence, the errors alleged in Petitioner's fifth habeas ground are meritless.

### F.      Failure to request instruction on a lesser included offense (Ground VI)

Petitioner next contends that his trial attorney failed to formally request an instruction on unspecified lesser included offenses to assault with intent to commit murder.  Petitioner suggests that the record contained no evidence of his intent to murder Sumner.

Petitioner's argument is frivolous.  His entire trial strategy, including his trial testimony, was directed at showing that he was not the person who shot Sumner and was not present at the time Sumner was shot.  Trial counsel reasonably did not pursue a conflicting strategy of proving that Petitioner acted without the requisite intent to kill, presumably because Petitioner was intoxicated.  If the jury believed that Petitioner was the person responsible for shooting Sumner, the facts before the jury – that the shooter fired shots at Sumner's forehead and temple – were inconsistent with any other intent than the intent to kill.  Trial counsel therefore acted reasonably in not requesting instruction on any lesser included offense.

G.       **Failure to properly advise about waiving a jury trial (Ground VII)**

In his seventh habeas ground, Petitioner contends that his trial attorney failed to properly advise him about the nature of his right to a jury trial, which he was waiving by requesting a bench trial. Petitioner argues that the court did not properly ascertain in open court that Petitioner's waiver of his right to a trial by jury was freely and intelligently waived, and counsel did not ensure that Petitioner was fully advised.

Petitioner's claim is wholly at odds with the record. The trial court asked VanZant if he wished to proceed with a bench trial, as defense counsel had represented, and it advised Petitioner of his right to a jury trial. Defendant expressly acknowledged that he understood that he had the right to a jury trial and affirmed he wished to have a bench trial. (10/17/2007 Hr'g Tr., 5, ECF No. 14.) Indeed, Petitioner elaborated on the reason he believed that a bench trial would be better for him. He reasoned that the evidence was circumstantial and that the witnesses' stories had changed. He speculated that the jury was more likely than the judge to be misled into thinking that the reason the stories had changed was that the witnesses were frightened. (*Id.*, 3, 5.) Moreover, Petitioner's attorney made an extensive record of his advice that Petitioner not waive his right to a jury trial and of Petitioner's understanding of the attorney's advice. (*Id.*, 3-5.)

As a consequence, it is apparent from the record that counsel fully advised Petitioner and that Petitioner freely and intelligently waived his right to a jury trial. *See Adams v. United States ex rel. McCann*, 317 U.S. 269, 277-78 (1942) (reiterating the requirements for waiver of a jury trial) (citing *Patton v. United States*, 281 U.S. 276, 312 (1930)). As a result, counsel both acted reasonably in advising Petitioner and reasonably in concluding that Petitioner had properly waived his right to a jury trial.

### H.    Failure to impeach with prior inconsistent statements (Ground IX)

Petitioner next argues that his trial attorney was ineffective in failing to impeach Moore and Secord with their prior inconsistent statements.  In particular, Petitioner contends, by obtaining the preliminary examination testimony, trial counsel could have impeached Michelle Moore's testimony on unspecified matters.

Petitioner's claim is both conclusory and frivolous.  Michelle Moore did not testify at the preliminary examination.  As a result, the transcript of the preliminary examination could not have been used to impeach her.  Moreover, Petitioner utterly fails to identify any inconsistencies in Secord's preliminary examination testimony that could have been used to effectively undermine her credibility at trial.  Trial counsel focused her cross-examination and trial stategy on undermining Moore's and Secord's testimony with their own unsavory behavior:  their drug and alcohol use on the evening; the leaving of Moore's child alone in Moore's apartment; Moore's and Secord's own guilt in attempting to rob Sumner; and the inconsistencies between the testimonies of Moore and Secord.  Counsel also drew out testimony Mr. Rincon had delivered drugs to the apartment that evening without receiving payment, which counsel used to suggest that Rincon planned to return to collect payment for those drugs and could have been the shooter.

On these facts, Petitioner's conclusory allegations that counsel failed to impeach Moore and Secord with their prior statements falls short of demonstrating either that counsel's performance was unreasonable or that Petitioner was prejudiced by any failure of counsel to impeach a prosecution witness.

### I.    Failure to obtain criminal records (Ground X)

In his tenth habeas ground, Petitioner argues that counsel failed to obtain the criminal histories of Moore and Secord and that, had she done so, she would have been able to impeach the

witnesses' credibility, as the women had "an extensive history of criminal activity." (Pet'r's Br. In Supp. of Pet., ECF No. 3, PageID.117.)

In Michigan, evidence of a witness' prior conviction of a crime is not admissible unless

(1)     the crime contained an element of dishonesty or false statement, or

(2)     the crime contained an element of theft, and

>    (A)  the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and

>    (B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.

MICH. R. EVID. 609(a)(1).

Petitioner's claim is both conclusory and frivolous. He has provided no evidence that counsel failed to obtain the criminal histories of Moore and Secord. The simple fact that the criminal history was not used is not evidence that it was not investigated. Moreover, Petitioner does not specify any particular criminal convictions of either Moore or Secord had that would have met the test encompassed under Rule 609. Finally, a reasonable attorney likely would have concluded that the existence of an admissible prior conviction was unlikely to undermine either witness' credibility more than the admitted evidence that the witness had directly obtained substantial benefits for her testimony in this case. Petitioner's conclusory allegations fail to show either that counsel's performance fell below a reasonable standard or that the claimed error was prejudicial.

IV.     Grounds XI to XIIII:  Ineffective Assistance of Appellate Counsel

-34-

In Ground XI of his habeas application, Petitioner contends that he was denied the effective assistance of appellate counsel when appellate attorney Valerie Newman was not present at his resentencing. Petitioner argues in Ground XII that appellate counsel was ineffective in failing to timely file Petitioner's pro per supplemental brief on appeal. Finally, in ground XIII, Petitioner argues that counsel was ineffective on appeal in failing to raise on direct appeal the issues presented in Petitioner's motion for relief from judgment.

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

### A. Denial of counsel at resentencing (Ground XI)

Petitioner relies on *United States v. Cronic*, 466 U.S. 648, 659 (1984), for the proposition that the denial of counsel at a critical stage of the proceeding is structural error entitling him to a new trial. However, Petitioner was not deprived of counsel at the resentencing proceeding. Instead, he was represented by different attorney from the State Appellate Defender's Office, rather than by Valerie Newman of that office, who had successfully handled the argument on the motion for resentencing.

-35-

Petitioner merely suggests that he would have had a better result st resentencing had Newman been present at his resentencing.

One element of the right to counsel under the Sixth Amendment is the right to have counsel of one's choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). However, the right to counsel of choice is not without limits. *Id.* at 148; *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). Moreover, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)). "'An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.'" *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990)); *see also Caplin & Drysdale*, 491 U.S. at 624 ("[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). Petitioner unquestionably was represented by counsel at resentencing. Even if he would have preferred Ms. Newman to be present, he fails to allege a *Cronic* violation.

Moreover, absolutely no Supreme Court precedent suggests that an attorney representing a defendant must be personally present at every proceeding of the case and may never send an attorney from the same office to represent the individual at a particular hearing. Further, Petitioner points to nothing in the attorney's representation at resentencing that fell short of the *Strickland* performance standard. As the Court previously discussed, the critical issues affecting resentencing were resolved at the hearing on the motion for resentencing, at which Attorney Newman strenuously argued and prevailed. The attorney who

appeared at resentencing gave no indication that she was not fully informed on the case. She ensured that the felony-firearm sentence was attached only to the assault with intent to murder, not the other charges, as decided at the prior hearing. (Resentencing Hr'g Tr., 4, ECF No. 19.) She also ensured that Petitioner received correct credit for his time served. (*Id.*, 5.) Further, counsel advocated that the court resentence Petitioner to a lower sentence in conformity with the new guidelines on the only conviction for which the change to Petitioner's new status as a third-offense felony offender resulted in different guidelines: the assault with intent to rob while armed. The court agreed not to depart from the sentencing guidelines, and so accepted defense counsel's request. (*Id.*, 10-12.) Petitioner utterly fails to demonstrate that counsel's performance fell below the *Strickland* standard or that he was prejudiced by counsel's representation. He therefore is not entitled to habeas relief on Ground XI.

### B.   Failure to timely file Petitioner's supplemental brief (Ground XII)

Petitioner argues that his appellate attorney was ineffective in failing to timely file a pro per supplemental brief on appeal under Standard 4 of Administrative Order 2004-6 of the Michigan Court of Appeals.

Petitioner's argument is frivolous. As the Court previously discussed, the original direct appeal included a motion to remand for resentencing, which was granted. After succeeding on the motion for resentencing and obtaining a new sentence, counsel promptly returned to the Michigan Court of Appeals and sought an extension of time to file a Standard 4 brief. The motion was denied. Because Petitioner was now able to file his direct appeal from the date of the resentencing, appellate counsel elected to voluntarily dismiss the first appeal and to file a new appeal in the Michigan Court of Appeals. (*See* 11/26/08 MCOA Ord, ECF No. 24.) Thereafter, counsel filed a new appeal and a brief setting forth issues not raised in the

first appeal. In addition, defense counsel filed a timely Standard 4 brief on Petitioner's behalf, which was accepted by the court of appeals and which ultimately was decided on the merits. As a consequence, even accepting Petitioner's dubious argument that counsel was ineffective in filing a timely Standard 4 brief in the original appeal, Petitioner cannot demonstrate that he was prejudiced in any way.

C.     **Failure to raise Grounds V through XII on direct appeal (Ground XIII**

In his final ground for relief, Petitioner contends that appellate counsel was ineffective in failing to present on direct appeal the grounds raised in Petitioner's motion for relief from judgment. As the Court has previously discussed, Petitioner failed to demonstrate that any of the grounds raised in his motion for relief from judgment were meritorious. Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). Petitioner's final habeas ground therefore will be denied.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to present a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial

-38-

showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   August 29, 2016              /s/ Paul L. Maloney
                                      Paul L. Maloney
                                      United States District Judge